The opinion of the Court was delivered by
Dunkin, 0. J.
The plaintiff, John Henry Colburn, is the youngest of three sons of James Smith Colburn and Sarah Dunn, his wife, formerly Sarah Dunn Prince. . His parents were natives of Massachusetts — probably of Boston, or the vicinity, and were married in 1808. The plaintiff was born in March, 1816, and resided with his mother in Boston until her death, in 1836. Soon after this event he came to reside with his father in Charleston, until 1841; when some differences arose, and they separated. They continued to reside in the same city until the death of James S. Colburn, which occurred on the 16th July, 1859.
These proceedings were instituted 7th December, 1859, against the principal defendant, who is the executor of the last will and testament of James S. Colburn, dec’d. The object is to obtain an account of certain personal property, alleged to have been the separate estate of the plaintiff’s mother, and which had been received by his father, the late James S. Colburn.
*229 The defendant, disavowing all personal knowledge of the matter charged in the bill, submits that, if Mrs. Sarah Dunn Colburn had any separate estate at the time of her decease in 1836, it vested absolutely and exclusively in her surviving husband. Such is admitted to be the law of Massachusetts. The inquiry is then presented whether Mrs. Colburn, at the time of her decease, was domiciled in that commonwealth or in the State of Sonth Carolina. ' The question of domicile,” says an eminent publicist, “ is often one of great difficulty and nicety, and so dependent upon circumstances, that, as it has been observed by Lord Stowell, (2 Eob. 322,) it is hardly capable of being defined by any general or preci-e rule. It is compounded partly of matter of fact and partly of law.” When such minds as those of Lord Stowell and Chief Justice Marshall differ widely as to the inference of domicile, from the same circumstances, (see 8 Cranch, 248,) the difficulty of establishing any positive rule may well be considered. The place of birth is ordinarily considered as the domicile. Not always —the party may be a minor, and his parents on a visit. Whether a guardian can change the domicile of his ward, according to his volition, .is not settled, (9 Mass. Eep. 543.) In all cases, it is important, (as urged by Ch. J. Marshall, in the case cited,) to examine into the reason of the 'rule. The general principle is that stated by Mr. Justice Story, (Story Conf. Laws, § 46.) “ The domicile of a married woman follows that of her husband. This results from the general principle, that a person who is under the power and authority of another, posesses no right to choose á domicile.” Thew ill of the wife is subordinate to that of the husband. As a general rule, she has no right to choose a domicile different from his, or in opposition to bis will. His domicile is her domicile. But circumstances may qualify this principle. In the case cited at the bar, Irby vs. Wilson, (1 Dev. & Bat. Ch. R. 568,) it was ruled by the Supreme *230 Coart of North Carolina "that a feme covert may acquire a domicile different from that of her husband, especially as to a suit between, her and her husband;” and in our own case of Bradley vs. Lowry, (Speers Eq. 1,) where the testatator left his established domicile in South Carolina, in 1836, and went to Alabama, where he died in the spring of 1837, a majority of the Court of Appeals inferred that the testator had abandoned his domicile in South Carolina, and acquired a new domicile in Alabama, principally upon the evidence “that he had disagreed with his wife — that they had separated — that she had gone to live in the family of her son-in-law, and that he declared they could no longer live together; that he broke up bis establishment, took his slaves with him, declaring he was going to the West to live, and that he would never return to this country.” The conclusion of the Court was, of course, just, to wit: that the husband was domiciled in Alabama. It was not equally clear that the deserted wife had also changed her domicile, and acquired a new residence in Alabama. The reason of the rule was wholly inapplicable. The wife had no choice but to remain where she was — and such was the will of her husband. Identity of domicile in husband and wife results from the principle that she is under his power and authority, and has no right to choose a domicile. The principle is salutary, and the reason cogent. But, as has been illustrated, the principle is. not an axiom, nor is the rule inflexible.
From their marriage certainly — probably from their nativity — the parents of the plaintiff resided in Boston, in which city James S. Colburn transacted business as a merchant. About the year 1818, he was unfortunate, and failed. In the autumn of that year, he, with his wife, came to Charleston, where they passed the winter, returning to Boston in the spring of 1819. Leaving Mrs. Colburn with her three children in Boston, James S. Colburn, in the *231 summer of 1819, returned to Charleston. They never met afterwards. Mrs. Colburn continued to reside in Boston, engaged in the education of her sons, the youngest of whom was then about three years of age. She there remained (says her son B. P. Colburn) until some time in the year 1836, the time of her death. • The witness, Edward Winslow, also a native of Boston, but residing in Charleston, knew the family intimately. Witness “lived as many as eighteen, years with Mr. Colburn in Charleston, at the same boarding-house. Witness was charged with messages to Mrs. Colburn from her husband, whenever he knew witness went North.” “ Witness visited Mrs. Colburn whenever he went to Boston. Mrs. Colburn lived in a fine dwelling-house in Boston, indicating an income of about $3,000. She lived in much comfort. Yisited her at Jamaica Plain, a place of resort near Boston, well situated, and suited for the residence of a person in comfortable circumstances.”
In determining a question of domicile, the intention of a party has great weight. But intention can only be judicially ascertained from acts, or conduct, and declarations. The mere surmises of friends or connections afford no evidence of intention. Some of the letters of Mrs. Colburn to her husband, as of late date as February and May, 1835, were put in evidence, They are full and confidential, but, in no part of them, is any allusion made to a removal of her domicile, as either expected or desired, on the part of herself, or of her correspondent. The lady had her griefs, and she did not fail to disclose them. But this subject formed no part of the catalogue. Nor is there anything whatever in the correspondence, or in any other part of the evidence, which would countenance a surmise that this arrangement was otherwise than entirely satisfactory to her husband — that it was not, in fact, his own arrangement, and acquiesced in as such.
*232 As Mrs. Colburn was born and bad always lived, so she died, a resident of Boston. If she acquired a domicile in South Carolinia it was not in deference to tbe will of her husband, but manifestly against his wishes, and in opposition to his settled convictions.
It is worthy of inquiry at what time James Smith Colburn himself became domiciled in South Carolina. On this subject, the judgment of Sir John Nicboll, in tbe Prerogation Court of Canterbury, (Curling vs. Shomlen, 2 Adams, 6,) has valuable suggestions. These cases,” (says he,) “ go fully to demonstrate one thing, namely, that the, forum erigirás is hardly shifted — that it continues at least-till it is completely abandoned, and another taken,” and again, “mere averments of intention, not deducible from the facts pleaded, are of no avail whatever in the cause ”
Mr. Colburn, having failed in business in Boston, came with his wife to Charleston, in the fall of 1818. Returning with her to Boston in the following spring, he made arrangements for the comfortable support of herself and family and came back to Charleston in 1819. The evidence of his intimate friend and fellow lodger, Edward Winslow, affords the only information as to his mode of life for several subsequent years. They were boarders at Jones’ hotel. “Mr. Colburn,” (says the witness,) “left Boston without satisfying his creditors. Is of the impression that Mr. Colburn stated to witness that he was willing to pay his creditors twenty cents on the dollar. Thinks whatever settlement he did make was made on that basis. Is satisfied that he did not reacquire his credit in Boston. Witness and Mr. Colburn lived as many as eighteen years in the boarding-house in Charleston.” Among the general principles to assist the Courts in determining questions of domicile, Mr. Justice Story enumerates the following: “Ninthly, the place where the family of a married man resides is generally considered as his domicile. But this *233 may be controlled by circumstances. Eor if the place is only a temporary establishment for his family, or for transient objects, it will be otherwise. Tenthly, if a married man has his family fixed in one place and does his business in another, the former is considered the place of his domicile.” Story Conf. L. § 46.
Who can undertake to say that, so late as the year 1836, the domicile of James S. Colburn was not determined by these principles? that, at any earlier period, he had (in the language of Sir John Nicholl) “ completely abandoned the forum originis,” — the home of his childhood and of his riper years — the unchanged residence of his wife and children— the place of his father’s sepulture ? Or, that during those years, when be was endeavoring, in his own way, to make terms with his Boston creditors, he did not always look to a return to his family and home, and that he was any other than a lodger and sojourner in the city of Charleston ? In that year (1836) great changes took place. His wife had ceased to live. His two sons were with him in Charleston. He had failed to re-establish his credit with the merchants of Boston. In his new abode he bad found men, who (in the grateful language of his will) “proved themselves friends in prosperity and adversity,” and he was content to pass with them the remainder of his days — to make South Carolina his permanent domicile. An eminent writer, already cited, says: “Sometimes, where there has been-a removal for temporary purposes at first, there may be engrafted on it, subsequently, an intention of permanent residence, and, in many instances, therefore, where we are called upon to decide upon questions of domicile, the length of time of the residence becomes a material ingredient.” All these considerations fix beyond doubt the domicile of James S. Colburn, after the year 1836.
In any view that may be taken, the Court would experience great difficulty in recognizing the position indispen *234 sable to the plaintiff’s success, to wit: that at the period of his mother’s decease she was domiciled in South Carolina.
But the judgment of the Court is based on other and independent considerations. Whatever rights the plaintiff had on 7th Dec. 1859, when his bill was preferred, he enjoyed equally in March, 1837, when he attained his majority. Riddlehoover vs. Kinard, (1 Hill, Ch. 376,) decided nearly forty years since, has become one of the landmarks of the law. It is commended to approval, as well from the authority of the distinguished jurist, who was the organ of the Court, as from the cases cited, and the wisdom and policy of the principles announced. Uriah Wicker died in 1808, leaving a widow and some collateral relations. His widow proved, in common form, an instrument supposed to be his will, by which his entire personalty was bequeathed to her, and she took out letters of administration with the will annexed. She, and those claiming under her, held the property for more than twenty years. After the death of the widow, and at the instance of the collateral relations, the will was required to be proved in solmen form, and was ultimately set aside, and proceedings instituted by the plaintiffs for a distributive share of the estate. “If” (says Chancellor Harper) “ there had been no will, and no administration, and defendants, without color of title, had taken possession of the property, and kept it for so long a time, I suppose their title would be good, under the decisions in Reed vs. Price, (State Report, 1,) and Hutchison vs. Noland, (1 Hill, 222); administration would have been presumed, and that defendants had acquired a title from the administrator. The lapse of twenty years is sufficient to raise the presumption of a grant from the State, of the satisfaction of a bond, mortgage or judgment, of the grant of a franchise or the payment of a legacy, or almost anything else that is necessary to quiet the title of property. After twenty years a bill of review will not lie. This is the general *235 equitable bar.” Again, “ it is hardly necessary to say that legal presumptions are not founded on actual belief. As observed by Lord Erskine, in Hillary vs. Waller, (12 Ves. 267,) mankind, from the infirmity and necessity of their situation, must, for the preservation of their property and rights, have recourse to some general principle, to take the place of individual and specific belief. Presumptions must be sometimes made against the well-known truth of the fact. If twenty years have elapsed without payment of interest, or any acknowledgment of the bond, we must presume it paid, notwithstanding the fullest conviction that it never has been paid. In Hutchison vs. Noland, it was proved by the ordinary that no administration had ever been taken out till granted to the plaintiff. As said in that case, we will presume whatever is necessary to give efficacy to long possession. If it were necessary (adds the Chancellor) to make any specific presumption in this case, I would presume, that the parties of full age at the time of the probate, released to Catharine Wicker their interest in the estate, or their right to contest the will.” Adverting to the relative situation of the testator., and his two sons, (the plaintiff' and B. P. Colburn,) in 1837, the application of these principles seems immediate and irresistible — other remarks are not less pertinent. “ If defendants would have been protected, if there had been no administration or probate, what makes the case worse for them, under present circumstances ? Is it that instead of being trespassers, committing a known wrong, they took possession under an apparently good title, for aught that appears honafide, believing the property to be their own? Their possession was still adverse — they claimed for themselves — this was known to all the world, and must be presumed to have been known to the complainants.”
Such presumptions are not permitted to screen fraud, or work injustice to the ignorant. But fraud is not to be *236 presumed —especially against the dead — nor ignorance inferred where there is “ light and liberty.” To these objections it is difficult to add anything to the satisfactory answers embodied in the Master’s report, which has been adopted as the decree of the Chancellor. As to the Boston property, so called, both the plaintiff and his brother knew as much in 1837 as they ever knew afterwards. The plaintiff actually preferred his claim after the death of his mother, and while the fund was still in the hands of Mr Ward. That claim was not pursued. Whatever may have been the motive, it seems a misapplication of terms to ascribe bis acquiescence to ignorance of his rights, with all the means of information before him, or to any fraud practised on his credulity. Much more natural is it to ascribe the subsequent silence and acquiescence, both of his brother and himself, (as the Chancellor has done,) to their filial deference, or “ prudential reasons for not making the demand in the lifetime of their father.”
But in reference to this “fund,” it may not be uninstructive to inquire how far the laots, imperfectly developed as they are, after this great lapse of time, and death of the parties interested in and cognizant of the transactions, are in accordance with the legal- presumptions. To afford any groundwork for the plaintiff’s claim, it is indispensably necessary to establish not only an interest of Mrs. Colburn in the Boston fund, but such absolute interest as was transmissible to her representatives. E. A. Colburn testifies, (and all the evidence confirms his statement,) that “ when his father left Boston, he was deeply indebted and bankrupt; and had he left any property, or owned any there at that time, it would have been taken by his creditors to pay his debts.” Finding himself in this situation, and being about to leave Boston for an indeterminate period, and also leave there his family, consisting of a wife and three sons, (the eldest about ten years of age,) he, in the summer of 1819, *237 executed an absolute conveyance to Samuel D. Ward, Esq., a lawyer of Boston, of “a certain dwelling-house and appurtenances, situated in Beacon street, Boston.” Immediately after executing this conveyance, James S. Colburn started for Charleston, and never afterwards returned to Boston. At a subsequent period, these premises were sold and conveyed by S. D. Ward to .Augustus Thorndike, for the consideration of twenty thousand dollars.
It is not remarkable that, at this distance of time, the details of this arrangement are involved in obscurity. It was not intended to be otherwise. The prominent objects of the parties are too patent to be misapprehended then or now. To three persons, and three persons only, all was fully known and they never misunderstood each other. The only survivor of these, (Mr. Ward,) neither party has thought proper to interrogate. But Mrs. Colburn was thoroughly acquainted with every feature of a transaction, in which no one was so deeply interested as herself. She knew of the deed to Mr. Ward, and was familiarly acquainted with the terms on which he had received it. While the Beacon street property was yet unsold, sbe received the rents and. profits; and, when converted into other securities, the interest and dividends were enjoyed by her. So late as February, 1835, she thus writes to her husband, in relation to his suggestion of taking an interest in stock of the Bank of Charleston, to stand in the name of Mr. W. and her son, B. P. Colburn : “It may be excellent property, but I do not think it would be as safe as it now is. I should not like to do it. If I did, I should never expect to see either principal or interest. But if you cboose it must be done, I must consent. You always told me to take care of myself, and I think it will be much more safe witb me than in Charleston.” “ I should bave sent you an exact memorandum bow my property is placed, but Mr. Ward is out of town. I hold all the papers, &c.” “I wish *238 you would give me some paper,.so I could hold all the furniture; I requested Benjamin to mention it to you.” Again, in her letter of 16th May, 1835, adverting to his urgency about the Bank of Charleston stock: "You still wish me to purchase some shares in the new bank, but I would rather not. I think it would not be as safe as it is now. If you were in want of'money, I would let jmu have it. I know you have got more than I have, and I think the little I have I had better take care of it myself. It will be better for both of us for me to keep what I have got under my own control. At any rate, I could not do it now without I sold bank stock, as the other money is loaned for one year from this time. Mr. Ward has no money of mine, and I have not any. I know there will be a time that you will thank me for wishing to keep the money myself. I shall never touch one cent of the principal without your advice. I shall keep it in such a way that no one can get it, let what might occur, but you. If I should die to-morrow, the children could not get one cent of it; it would belong to you.” Mrs. Colburn died in the following year.
Mr. Ward (a lawyer of position) was aware of the nature of the trust which he had assumed, and of the responsibilities which he had incurred. Within a few months after the death of Mrs. Colburn, he accounted for, and paid over to James S. Colburn the entire fund which he had received for the Beacon street property intrusted to him in 1819. The only remaining party was James S. Colburn himself, and he has not left to inference his entire satisfaction with the manner in which Mr. Ward had conducted, and had finally discharged the duties confided to him by the original arrangement. The declarations, and the conduct of every person cognizant of the transaction, unite in the conclusion that, when the family were dispersed, and Mrs. Colburn was no longer alive, the purposes of Mr. Ward’s steward *239 ship were accomplished, and the trust was at an end. And such, too, is the presumption arising from long acquiescence.
But it is said there was also separate property in Charleston. Certainly, it appears from the Master’s report, that, at the time of Mrs. Colburn’s death,-there were standing in the name of “ Mrs. Sarah Dunn Colburn,” certain stocks, to wit: 24 shares in the Planters’ and Mechanics’ Bank, 6 shares in Bank of South Carolina, 9 shares in the Union Bank, and 3 shares in State Bank, valued, in the aggregate, at §1,645. The Master says, “The origin of these investments is involved in even more obscurity than that of the property in Boston. The pleadings give no information as to when or by whom the investments were made, nor to whom the dividends were paid, and the testimony is entirely silent upon the subject.” “Mr. Colburn” (as one of the witnesses said) “ kept his pecuniary matters to himself.” But, so late as 1835, his wife had written to him from Boston, for “ some paper from him by which she could hold all the furniture.” It is vain to conjecture as to the history of this stock. It is known only that, from the death of his wife, James S. Colburn claimed all as his own. In 1837, he applied to the Union and State Banks for a transfer of the shares into his individual name. His son, Benjamin P. Colburn, on that occasion, signed the following certificate:
“ I certify that there was no marriage settlement, either before or after marriage, between my father, James Smith Colburn, and my mother, Sarah Dunn Colburn, and that there is no claim on the part of myself or any other member of the family to prevent his marital rights attaching on certain shares in the Union Bank, standing in the name of my said mother, (now deceased,) which shares can be transferred to my father in his own name.
“ (Signed) B. P. -Colburn.
“ Charleston, November HkA, 1837.”
*240 William Lance, Esq., Solicitor of the bank, thereupon certified.
“ Mr. Colburn can have the shares transferred into his own name, he being legally, as husband, entitled to them.
“(Signed) Wm. Lance,
“ Solicitor.”
The shares were accordingly transferred.
In his bill the plaintiff adverts to this fact, and states that “the said James Smith Colburn did possess himself of certain bank stock and other property of the said Sarah Dunn without administering upon the estate;” but that two of the banks refusing to pay him the dividends unless he administered, he, the said J. S. Colburn, in 1843 or 1844, applied to the Ordinary for letters of administration; that the plaintiff opposed the application of his said father, “ he, J. S. Colburn, still insisting that he was entitled to the whole estate of tbe plaintiff’s mother.” The petition of J. S. Colburn, filed late in 1843, sets forth the reasons of the application, and that the petitioner was desirous of having the shares and dividends transferred to him. The petition for letters was granted, notwithstanding the plaintiff’s opposition.
■ It is nowhere averred or suggested — the contrary is manifest from what has been said — that the plaintiff was ignorant of the transfer in 1837, and of his father’s persistent claim to the entire fund. The Master remarks, “ Mr. Colburn’s subsequent acts as administrator, show that his sole object in taking out administration was to aid him in converting the stock to his own use as husband of the deceased.” The concluding summary of the Master is entitled to consideration: “As to the Charleston bank stock, the plaintiff knew in 1843, when he opposed the application of his father for administration, that a portion of the shares had already been converted by him to his *241 own use, and that tbe sole object of tbe application was to enable him to convert the rest. All this was stated in the petition for administration, which the plaintiff was opposing, &c.” “ As to Benjamin P. Colburn, tbe evidence of notice is, if possible, still more clear.” .“It seems to me incontrovertible,” (concludes the Master,) “ that the present claimants have, for twenty years slept upon their rights, and permitted the claim of tbe father to the entire estate to be asserted without protest or interference on their part, and his enjoyment of the property under said claim to continue undisputed up to the time of his death.”
Nor, in the judgment of this Court, is the defendant’s plea of the statute of limitations a less formidable difficulty in the way of the plaintiff’s success. In Moore vs. Porcher, (Bail. Eq. 197,) Chancellor Harper says, “ I am of opinion, from the reason and 'analogy of the law, that when a trustee does an act, which purports to be a final execution of his trust, the statute will begin to run from that time so as to bar an account.” Again, “ The possession of a trustee is not adverse; it is the possession of the cesiui que trust, and the statute does not apply; but when he does an act purporting to be an execution of the trust, he shakes off the character of trustee, and thenceforward stands in an adverse relation. If the cesiui que trust supposes that the trust has not been fully and faithfully performed, he is put upon the assertion of his right.” In Long vs. Cason, (4 Rich. Eq. 60,) Chancellor Wardlaw announced the judgment. “Technical trusts, as to claims between trustees and beneficiaries, are not within the statute of limitations. But, to use the language of our last reported case on this subject, (Brockington vs. Camlin, 4 Strob. Eq. 196,) ‘if the trustee does an act which purports to be a termination of the trust; if he has a settlement which is intended to be in full; if he settles as to part and claims the residue in his own right; if be denies the trust in the presence of the cestui que trust; *242 these acts, or any of them, will so far disturb and dissolve the strictly fiduciary relations between the trustee and his cestui que trust, ns that the statute of limitations will commence to run' from the date of such acts.’ This doctrine” (adds Chancellor Wardlaw) “is fully supported by authority.”
In 1843, the plaintiff knew that J. S. Colburn claimed the bank stock in his own right 'and for no one else. Knowing this, he opposed the grant of administration. When the letters were granted, James S. Colburn, on 30th October, 1844, filed an inventory still claiming the shares as his own property, and filed an account, aud again in 1847. The last return made was 14th July, 1853, which was accompanied by an affidavit of the administrator that the entire assets of the said estate had long since vested in and exclusively belonged to him, and that he, as administrator, had assented to and received the same in his own right, and that the accompanying certificates (referring to the certificates of William Lance, Solicitor, and B. P. Col-burn, already cited) will further confirm the above statement; and that, in all other respects, the assets of said estate were fully administered and settled, and prays the same may be so declared. Whereupon the Ordinary, on the same day, made the following entry: “ I do hereby certify that I have this day examined the foregoing account; that James Smith Colburn, administrator, upon his oath declared that he had received no other moneys on account of the estate of Sarah D. Colburn, deceased; and as appears by annexed affidavit and certificate, that annexed account is a true statement of the actual condition of funds therein stated, and that the same be declared to be fully administered and settled, and that he acknowledges the receipt, in his own right, of all the estate mentioned in the return.
“ Final settlement.
“ (Signed) George Buist, O. O. D.”
*243 In 1843, then, when J. S. Colburn assumed his official character, he denied that he held for the plaintiff. In the language of the authority, he “ denied the trust in the presence of the cestui qué trust.''1 Thenceforward he was put on the inquiry. As is said in 1 Hill Ch. 300, “the Ordinary’s office was open to him.” But much more in July, 1853. After the plaintiff had been advised of the adverse holding and put on the inquiry, when the final settlement was made with the Ordinary, the administrator “ shook off the character.of trustee, and, thenceforward, stood in an adverse relation. If the cestui que trust supposed the trust had not been fully and faithfully executed, he was put upon the assertion of his right.” (Bail. Eq. 198.) Certainly, from this date the currency of the statute commenced, and in four years the plaintiff was barred. Nor is this result in any manner affected by the petition filed in March, 1858, in which the petitioner sets forth that “ he was sole heir and distributee of the estate,” but prays for an order for the sale of some of the stock, as he was advised such order was necessary. The right was barred by the statute before the petition was filed. But the proceeding was purely formal, and obviously for the sole purpose of meeting the difficulty arising out of the construction given to the Act of 1824.
Having arrived at the conclusion that the plaintiff’s claim cannot he sustained without a violation of established principles of this Court, the remaining duty of the Court is to dismiss the bill. But it is manifest from the history of the transaction that, whatever may have been the errors of the plaintiff in his intercourse with his father, he was “much more sinned against than sinning.” The mysterious character of his father’s transactions, and the solemn mockery with which (as it appears) he, in his last moments, trifled with the natural expectations of his son, were well calculated to awaken suspicion and to provoke inquiry.
*244 It is ordered and adjudged that the bill be dismissed, each party to pay his own costs.
Wardlaw, A. J., and Glover, J., concurred.

Bill dismissed.